UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | |
|---|---|
| TERRENCE L. EVERETT, SR. ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: 4:23-cv-140 |
| ) | |
| WASTE CONNECTIONS, INC., ) | |
| ) | |
| and ) | |
| ) | |
| BAY DISPOSAL, LLC, ) | |
|     Defendants. ) | |

## COMPLAINT

Plaintiff Terrence L. Everett, Sr. ("Everett"), for his Complaint against Waste Connections, Inc. and Bay Disposal, LLC ("Defendants"), states as follows:

## NATURE OF ACTION

1. Everett brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and 42 U.S.C. § 1981, in that Defendants discriminated and retaliated against Everett and created a hostile work environment in violation of Title VII and/or 42 U.S.C. § 1981. Everett also brings this action under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (hereinafter the "ADA") against Defendants for failure to provide reasonable accommodations and for discriminating and retaliating against Everett because of his disability or his record of a disability, and his requests for a reasonable accommodation.

1

2. Everett seeks legal and equitable relief to redress the injuries done to him by Defendants, injunctive relief, back pay, compensatory and punitive damages, and reasonable attorney's fees and costs.

## JURISDICTION AND VENUE

3. This Court has original jurisdiction to hear this Complaint and to adjudicate the claims stated herein under 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 12117 (a) and/or 28 U.S.C. §§ 1331 and 1343.

4. Venue is proper in the Eastern District of Virginia and in the Newport News Division under 42 U.S.C. § 2000e-5(f) which provides that venue is proper in any district court in the state; see also *General Electric Co. v. Merhige*, 1972 U.S. App. LEXIS 6632, No. 72-3327, 1972 WL 2610 (4th Cir. Nov. 20, 1972) (unpublished) (applying provision). The claims presented herein arose and Defendants reside within this judicial district and division.

5. Everett has exhausted all necessary procedural prerequisites and has filed his Title VII and ADA claims within ninety (90) days of his receipt of a "Right to Sue" letter from the Equal Employment Opportunity Commission.

## PARTIES

6. Everett is an African American, male resident of Newport News, Virginia. At all times relevant to the matters alleged herein, Everett was an employee within the meaning of Title VII pursuant to 42 U.S.C. § 2000e(f) and a qualified individual with a disability within the meaning of the ADA pursuant to 42 U.S.C. § 12111(4). At all times pertinent hereto, Everett was

employed by Defendants as Residential Driver. At all times pertinent hereto, Defendants employed more than 500 employees.

7. Defendant Waste Connections, Inc. ("Waste Connections") is a Canadian corporation that is the ultimate parent company of Bay Disposal, LLC. Waste Connections is the third largest solid waste management company in North America with a network of operations in 43 states and 6 provinces. At all times pertinent hereto, Waste Connections has been an "employer" within the meaning of 42 U.S.C. § 2000(b) and has been subject to the provisions of Title VII, employing over 7,000 employees. Waste Connections operates in Norfolk, the Hampton Road area and Williamsburg, Virginia.

8. Defendant Bay Disposal, LLC ("Bay Disposal") is a subsidiary of Waste Connections. It is a locally operated residential and commercial waste collection, solid waste disposal, and recycling company serving the Norfolk, Virginia area. Bay Disposal was established in 2000. Waste Connections acquired Bay Disposal on or about January 1, 2018. Bay Disposal states on its website that it considers "our employees part of the Bay Disposal & Recycling family and treat them with fairness and respect."[1] Bay Disposal operates in Norfolk, the Hampton Road area and Williamsburg, Virginia.

9. Waste Connections and Bay Disposal have been Everett's joint employer and jointly exercise control over the terms and conditions of Everett's employment.

---

[1] www.baydisposal.com/company/about-us, last visited November 10, 2023.

## FACTS

10. Everett became employed by Defendants in November of 2018 as a Residential Driver.

11. Everett was hired and remains employed with Defendants as a residential side-arm truck driver. Everett's starting salary was $15 per hour.

**Defendants Pay African American Drivers Less Than White Drivers.**

12. Defendants paid African American drivers less than White drivers. Everett, Coleen Newton and Keith Tynes, all African American drivers for Waste Connections, Inc., complained to Site Manager Richard Hill ("Hill") about racial pay inequities.

13. When Defendants refused to increase the pay of African American drivers Newton and Tynes quit.

14. When Everett filed his EEOC charge on April 28, 2021, Defendants suddenly gave him and other African American drivers a raise from $17.46 to $22.00.

15. Defendants failed to compensate Everett and the other African American drivers for the racially disparate pay they had received for years.

**Defendants Assign Routes in Racially Discriminatory Fashion.**

16. Defendants assigned routes in discriminatory fashion. White drivers received city routes which were typically about 30 miles long.

17. In contrast, Defendants assigned rural routes, which were as long as 200 miles, to African American drivers.

**Defendants Monitor Drivers in Racially Discriminatory Fashion.**

18. Defendants operate a monitoring system, "ThirdEye," to observe its drivers. ThirdEye uses in-truck cameras to monitor Defendants' drivers.

19. While ThirdEye can operate automatically, observing drivers in a racially neutral, arbitrary cycle, Defendants use it primarily to monitor their African American drivers.

20. For the period July 1, 2020, to September 30, 2020, Defendants monitored Everett 87 times without finding any infractions.

21. For the same time period Defendant monitored African American driver Corey Chandler 85 times without finding any infractions.

22. Defendant monitored African American driver Vince Cousin 70 times without finding any infractions.

23. In stark contrast, Defendant monitored White driver Christine Hakey one time during these three months, they monitored White driver Steve Garrett 16 times and White driver Pete Schneider ("Schneider") three times.

**Defendants Create a Racially Hostile Environment.**

24. Defendants permit White employees to display racist symbols at work.

25. Everett complained that mechanics wore confederate flags on their shirts, as well as other racist symbols.

26. Defendants ignored his complaints.

27. In February of 2022, Everett found an "Aunt Jemima" syrup jug in Defendants' bathroom. Defendants were using the container with the racist image as a soap jar.

28. Defendants ignored his complaints about this racist image.

29. Defendants have ignored Everett's complaints about these racist symbols. Instead of eliminating these racist symbols at the workplace, Defendants have accused Everett of being "negative."

**Defendants Assigned Saturday Overtime to White Workers.**

30. All drivers for Defendants work some amount of overtime. Everett was required to work extra hours before and after his regular shift on weekdays.

31. However, overtime work on Saturdays was very popular among the drivers and was considered a "plum" assignment because it was less demanding.

32. Everett repeatedly asked for overtime work on Saturdays but never received any.

33. In contrast, Schneider frequently worked overtime on Saturdays. Everett worked five days per week (Monday through Friday) and Schneider worked four days per week (Monday through Thursday), but, on information

and belief, Schneider's paycheck was often for 20 to 30 hours more than Everett's.

**African American Residential Drivers, Such as Plaintiff, Are Assigned Less Attractive and More Physically Demanding Routes Than White Drivers.**

34. In 2020, Everett's normal work week started at 5:30 am on Mondays, and he arrived at his first destination at 7:00 am.

35. Everett's route consisted of several residential areas in Williamsburg, Virginia, as well as several Newport News areas around Denbigh and midtown Newport News. Once he had completed his route, Everett was required to help service recycling routes for the rest of the day.

36. Everett's Monday workday was completed after more than 100 miles of driving where he had to pull, manually, over 30 trash cans.

37. The trash cans themselves are 95-gallon containers and weigh 33 pounds when empty.

38. In stark contrast, Schneider, a White residential side-arm driver, also started his workday on Mondays around 5:00 am and arrived at his first destination at 7:00 am. He serviced Poquoson neighborhoods. His entire route had a radius of less than 20 miles. He did not have to pull any trash cans manually.

39. On Tuesdays, Everett's workday began earlier than 5 am because he was required to service the city cans located in downtown Newport News –

an area that included several high crime neighborhoods – where many trash cans were located near bus stops. Here, Everett had to get out of his truck, pull the can to the truck to get dumped and then pull the empty can back.

40. On Tuesdays Everett had to come in early and service those city cans before starting his own route. There were approximately 25 city cans located near bus stops that Everett had to service, including 10 large trash cans. The cans had to be pulled to the truck, dumped and put back, all manually. After servicing these city cans, Everett had to work on his own route, which consisted of neighborhoods in Fort Eustis, Denbigh, and midtown Newport News. Once he had completed his route, Everett was required to help service recycling routes for the rest of the day which was normally around 5 or 6 pm.

41. Schneider stated that he did not feel safe servicing the high crime neighborhoods, and Defendants assigned him the neighborhood in Poquoson. His entire route had a radius of less than 20 miles. He had no cans to pull manually.

42. On Wednesdays Everett usually came to work at 5:30 am and serviced Williamsburg neighborhoods which included four stops where cans had to be pulled to the truck and pulled back to their original location. There were roughly 50-60 cans that had to be serviced in addition to Everett's normal route which required him to get in and out of his truck over 40 times.

43. Schneider arrived on Wednesdays at work around 5am and his route started at 8am. He serviced Williamsburg neighborhoods as well. His duties consisted of driving only and he did not have to pull any cans. At some houses, there were trash bags left next to the cans, but he was not required to pick those up, either. The end time on Schneider's route was 4pm.

44. On Thursdays Everett usually came to work at 6 am to work the Poquoson route. Since his truck was much smaller than Schneider's he had to leave his route and drive to the trash dump site every three hours, while Schneider only had to empty his truck every 5 ½ hours.

45. Schneider serviced the neighborhood in Poquoson every Thursday.

46. On Fridays, Everett's workday began between 4 and 5 am where his route included 25 cans in downtown Newport News near bus stops. These cans had to be pulled to the truck, dumped and put back, all manually. After servicing these city cans, Everett had to work in neighborhoods in Hampton, including an apartment complex where 50 trash cans had to be pulled to the truck and back. Everett then serviced his regular route.

47. Schneider did not have a route on Fridays, and he was not required to pull any cans. Schneider still came to work and was allowed to clock in and get paid for eight hours. He was not required to help on Everett's route at all although Everett and Schneider were the only two residential trash drivers at the time.

**Everett Requested an Accommodation For His Disability.**

48. In 1992, Everett had surgery on his shoulder to treat his chronic post-traumatic osteoarthritis.

49. Since then, Everett has suffered and continues to suffer from chronic post-traumatic osteoarthritis which affects his ability to lift and pull, among other life activities. His disability manifests with episodic flare-ups from time to time and causes pain, swelling, and inflammation.

50. In October of 2020, Everett suffered a flare-up, and his physician placed him on light duty with restrictions against lifting or pulling anything heavier than 25 pounds. His light duty was supposed to last from October 2, 2020, to November 3, 2020.

51. Trash cans, even when empty, weigh more than 33 pounds, so they were too heavy for Everett.

52. Everett's routes require him to pull cans heavier than 25 pounds at each location, anywhere from 10 to 75 feet.

53. Everett told his supervisor, Keith Sykes ("Sykes"), about his disability and his need for an accommodation in October of 2020.

54. Everett also provided medical documentation to Defendants. Despite his lifting and pulling restrictions, Sykes ignored the medical documents and requests for accommodation and gave Everett no assistance nor

engaged in an interactive process, ignoring Everett's frequent reminders and notifications that he was in pain.

55. Defendants' refusal to accommodate Everett by putting him on light duty exacerbated the flare-up. Everett told Sykes that manually pulling 50 cans in a day made his arm stiffen. Everett also showed Sykes scars on his shoulder from previous surgeries.

56. Sykes stated that he had contacted Hill about Everett's request but that Hill had insisted that Everett would have to continue servicing his routes.

57. Everett continued working despite his swollen shoulder and increasing pain. When over-the-counter pain medication did not numb the pain sufficiently, his wife, a nurse, insisted that he follow-up with a doctor.

58. Everett made an appointment with his primary care physician for October 30, 2020. He met with Hill and Sykes on October 28, 2020, to tell them about his appointment. Both men told him he needed medical documentation.

59. On October 30, 2020, Everett received further medical treatment, and his physician placed him on a 25-pound restriction from November 2 to December 2, 2020.

60. On November 4, 2020, Sykes helped Everett at one stop and, together with another helper pulled approximately 20 cans. However, Everett then had to finish his route by himself, pulling another 30 cans. Sykes left to

11

help Schneider with his route. When Everett asked for further help, Sykes, responded, "Hang in there for nine more days."

61.    Everett complained to Human Resources in mid-November of 2020, and John Morgan ("Morgan") responded on November 16. When Everett told Morgan that he had medical documentation about his weight restrictions, Morgan responded, "Wow, we dropped the ball on this one. We only had this company a few years and haven't heard anything good about them."

62.    Everett sent Morgan a copy of his medical notes and a video of him pulling cans while on weight restrictions. Morgan promised to forward the information to District Manager Emmett. However, nothing changed, and Everett continued to struggle and work in pain.

63.    Everett had another medical appointment on November 25, where his orthopedic physician noticed further inflammation of the shoulder. X-rays revealed loose bone fragments in Everett's shoulder. When Everett told the doctor that he still had to pull trash cans and showed him a video of his work, his physician ordered him to take medical leave.

64.    When he returned to work on December 7, 2020, he still had limited range of motion in his right upper extremities due to post traumatic osteoarthritis.

65.    Sykes refused to give him different routes, so Everett continued working his old routes and pulling cans.

66. Everett was the only side-arm truck driver required to get out of the truck and pull cans behind apartment complexes, retirement homes and daycare centers.

67. Schneider had a route where he could use the remote-control arm of his truck to grab cans. He did not have to pull cans manually.

68. On or about February 28, 2021, Everett was again in a lot of pain and requested a reasonable accommodation. Defendants refused.

69. Everett had surgery on his shoulder and was on medical leave without pay for 16 weeks.

70. Everett continued to work his old routes – pulling 169 trash cans manually – until September of 2021.

71. In September of 2021, Everett finally was allowed to move to a recycling route, a route that had been open and available for months.

72. Everett continues as a driver for the recycling route to this day.

73. As a result of Defendants' unlawful action, Plaintiff lost opportunities to earn overtime and income.

74. Defendants' decision to discriminate against Plaintiff was made in willful, blatant and intentional disregard of and in violation of Plaintiff's rights under Title VII, 42 U.S.C. § 1981 and the ADA.

## COUNT I
## TITLE VII – RACE DISCRIMINATION AND RETALIATION

75. Each of the preceding paragraphs is incorporated herein by reference.

76. Plaintiff, because of his race, was denied terms and conditions of employment in violation of Title VII of the Civil Rights Act of 1964, as amended.

77. Defendants' discrimination against Plaintiff was an intentional or reckless disregard of Plaintiff's rights under Title VII of the Civil Rights Act of 1991, 42 U.S.C § 2000-e *et seq*, as amended.

78. Defendants engaged in discriminatory actions described above with malice, or with a reckless indifference to Plaintiff's legal rights. Plaintiff is therefore entitled to punitive damages for Defendants' actions alleged herein.

79. Plaintiff has been damaged as a result of Defendants' unlawful conduct. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered great humiliation, distress, embarrassment, inconvenience, mental anguish, pain, suffering, injury and damages, including damage to his reputation and good will, loss of income, litigation expense including attorney's fees, and consequential damages and other injury.

80. Due to the severity of the conduct by Defendants, Everett is entitled to punitive damages.

### COUNT II
### DISCRIMINATION ON THE BASIS OF RACE AND COLOR
### IN VIOLATION OF 42 U.S.C. § 1981

81. Each of the preceding paragraphs is incorporated herein by reference.

82. Defendants, by and through their agents and employees, discriminated against Everett on account of his race and color in a manner that substantially and adversely affected the terms and conditions of his employment. Among other things, Defendants paid Everett less than White employees who performed the same job, treated Everett less favorably than White employees during his employment, and then assigned him routes with less favorable working conditions, based upon his race and color; and because he spoke up about his disparate treatment and harassment as well as the effect the discrimination was having on him, in violation of 42 U.S.C. § 1981.

83. Defendants engaged in discriminatory practices with malice and reckless indifference to the federally protected rights of Everett.

84. Plaintiff has been damaged by Defendants' actions, including, but not limited to loss of employment, loss of compensation and employment related benefits, loss of health insurance for Plaintiff and his daughter, and litigation expense including attorney's fees.

## COUNT III
## ADA – 42 U.S.C. 12101 *et seq.*
## DISPARATE TREATMENT AND FAILURE TO ACCOMMODATE

85. Each of the preceding paragraphs is incorporated herein by reference.

86. All the acts of the Defendants' employees alleged herein were undertaken in the course and within the scope of their employment and on behalf of the Defendants.

87. Everett suffers from chronic post-traumatic osteoarthritis.

88. Everett is and has been a qualified individual with a disability as those terms are defined by the Americans with Disabilities Act.

89. Everett went on medical leave in November of 2020.

90. Everett informed Defendants of his disability.

91. Everett requested reasonable accommodations for his disability.

92. Defendants failed to accommodate Everett and forced him to continue pulling trash cans manually, on pain of termination.

93. Defendants' actions were done in willful violation of Plaintiff's rights under the Americans with Disabilities Act.

94. As a direct and proximate result of Defendants' actions, Plaintiff has suffered, continues to suffer, and will in the future suffer injury and damages, including lost wages, embarrassment, inconvenience, humiliation, severe mental anguish, pain, suffering, litigation expense including attorney's fees, medical expense, consequential damages and other injury.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Terrence Everett, requests judgment against Defendants as follows:

A. For appropriate declaratory relief regarding the unlawful acts and practices of each Defendant, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Americans with Disabilities Act;

B. For an award of compensatory damages against Defendant Waste Connections, Inc.;

C. For an award of punitive damages against Defendant Bay Disposal, LLC;

D. For pre-judgment and post judgment interest;

E. For an award of back pay for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Americans with Disabilities Act against both Defendants;

F. For an aware of an amount sufficient to offset any adverse tax consequences resulting from a lump sum aware or an aware of other relief in this action because he was required to file suit to enforce his federally protected rights;

G. For an award of incidental and consequential damages, actual attorney's fees and costs of this action, including expert witness fees; and

H. For such other and further relief to which Plaintiff may show himself justly entitled.

**TRIAL BY JURY IS REQUESTED**

                                          TERRENCE EVERETT

                                          _____*/s/ Tim Schulte*___
Tim Schulte (VSB # 41881)
Blackwell N. Shelley, Jr. (VSB #28142)
Shelley Cupp Schulte, P.C.
3 West Cary Street
Richmond, Virginia 23220
(804) 644-9700
(804) 278-9634 [fax]
schulte@scs-work.com
shelley@scs-work.com

*Counsel for Plaintiff*